TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
ALYSSA BROWN (SBN 301313)
*abrown@ahdootwolfson.com*
YUFEI WANG (SBN 346170)
*ywang@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHELBY WOLFE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMGEN INC.,<br><br>Defendant. | Case No.: 2:26-cv-08815<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **Negligence**<br>2. **Negligence Per Se**<br>3. **Breach of Implied Contract**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shelby Wolfe ("Plaintiff"), individually and on behalf of all others similarly situated ("Class members"), upon personal knowledge of facts pertaining to Plaintiff and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendant Amgen Inc. ("Amgen" or "Defendant").

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to secure and safeguard the sensitive personally identifying information (PII) that it collected and maintains as part of its regular business, health insurance information and general health information, which is protected health information (PHI) (collectively with PII, "Personal Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

2. On July 31, 2026 Amgen disclosed in SEC Form 8-K that it suffered a data breach (the "Data Breach"), which it considers material. In the filing, Amgen confirmed that in July 2026, it identified unauthorized activity in cloud environments hosted by third-party providers, and that proprietary data, patient PHI, and other information had been exfiltrated.

3. As a result of the Data Breach, the Personal Information of potentially many Class members was disclosed

4. Little information has been made available by Amgen about the Data Breach. Though Amgen claims that it "committed to respecting . . . privacy,"[1] it has provided virtually no critical information concerning the Data Breach to the public and those individuals who may have been affected.

5. Defendant was well aware of or should have known of its data security shortcomings. It collects and maintains sensitive Personal Information for everyday business purposes, including highly sensitive PHI.

[1] https://www.amgen.com/privacy-statement (last visited August 7, 2026).

6. Defendant's failure to ensure that its servers and systems were adequately secure—and/or that the data it entrusted to third-party providers would be safe in the hands of those providers—fell far short of its obligations and Plaintiff's and Class members' reasonable expectations for data privacy, jeopardized the security of Plaintiff's and Class member's Personal Information, and exposed Plaintiff and Class members to fraud and identity theft or the serious risk of fraud and identity theft.

7. As a result of Defendant's conduct and the resulting Data Breach, Plaintiff and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they have either suffered fraud or identity theft, or face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## PARTIES

8. Plaintiff Shelby Wolfe is an adult citizen of the state of Kansas. Believing Amgen would implement and maintain reasonable security and practices to protect Personal Information, Plaintiff provided Personal Information to Amgen in connection with seeking and obtaining employment with Amgen. Had Plaintiff known that Amgen does not adequately protect Personal Information, Plaintiff would not have agreed to provide Amgen with Personal Information, or otherwise would not have consented to Plaintiff's Personal Information being provided to and received by Amgen.

9. Defendant Amgen is a corporation organized under the laws of the state of Delaware, with a principal place of business located at One Amgen Center Drive, Thousand Oaks, California 91320.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00), there are in excess of 100 Class members, the action is a class

action in which one or more Class members are citizens of states different from Defendant, and Defendant is not a government entity.

11. The Court has personal jurisdiction over Defendant because Defendant has a principal office in Thousand Oaks, California, operates in California, conducts other significant business in California, and otherwise has sufficient minimum contacts with and intentionally avails itself of the markets in California.

12. Venue properly lies in this judicial district because, *inter alia,* Amgen has a principal place of business in this district; Defendant transacts substantial business, has agents, and is otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A. Amgen Collects and Stores Personal Information

13. Amgen is multinational biopharmaceutical company operating in 12 major cities across the United States and nearly 50 countries across the globe.

14. Amgen routinely collects sensitive Personal Information in order to provide services to customers and patients, or as part of employing its employees. This information includes, on information and belief, "phone book" information such as names, email addresses, phone numbers, mailing addresses, but also includes highly sensitive and private information, including Social Security Numbers, driver's license numbers, passport numbers, employee identification numbers, insurance policy numbers, bank account numbers, information related to an individual's assets and income, occupation and employment status, dependent information other relevant financial information, and sensitive medical and health information and records.

15. According to Amgen's website, Amgen "collects, uses and discloses various types of personal information about patients, healthcare providers, clinical trial participants, customers, Amgen staff members or their representatives, and others for a

variety of lawful business purposes."[2] Amgen admits that the "use of such information is important to Amgen's business activities."[3]

16. Defendant is and was aware of the sensitive nature of the Personal Information it collects, and it acknowledges the importance of data privacy, claiming that it is "committed to respecting your privacy."[4]

17. Plaintiff and Class members provided their Personal Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

18. Plaintiff and the Class members have taken reasonable steps to maintain the confidentiality of their Personal Information. Plaintiff and Class members relied on the sophistication of Defendant to keep their Personal Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class members value the confidentiality of their Personal Information and demand security to safeguard their Personal Information.

19. Defendant had a duty to adopt reasonable measures to protect the Personal Information of Plaintiff and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep Personal Information safe and confidential.

20. Defendant had obligations created by the Federal Trade Commission ("FTC") Act, HIPAA, contract, and industry standards, to keep Personal Information confidential and to protect it from unauthorized access and disclosure.

---

[2] https://www.amgen.com/about/how-we-operate/policies-practices-and-disclosures/business-conduct/protection-of-personal-information (last visited Aug. 7, 2026).

[3] *Id.*

[4] https://www.amgen.com/privacy-statement (last visited Aug. 7, 2026).

21. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class members' Personal Information. Without the required submission of Personal Information, Defendant could not perform the services it provides and function as a business.

22. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Personal Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Personal Information from disclosure.

**B. <u>The Data Breach</u>**

23. On or about July 31, 2026 Amgen disclosed in SEC Form 8-K that it suffered a data breach (the "Data Breach").

24. In the Form 8-K, Amgen confirmed that in July 2026, it identified unauthorized activity in cloud environments hosted by third-party providers, and that proprietary data, patient PHI, and other information had been exfiltrated.

25. Per its regulatory filing, on July 29, Amgen determined the Data Breach was material, based on its evaluation of how many files potentially are affected and the possibility that the information in those files could be sensitive.

26. Amgen has provided virtually no information about the Data Breach to impacted or potentially impacted persons about the Data Breach. It has not provided necessary details that would allow Plaintiff and other Class members to evaluate whether their information is or will be adequately protected in the future.

**C. <u>Impact of the Amgen Data Breach</u>**

27. The actual extent, scope, and impact, of the Data Breach on Amgen's customers, patients, and employees (or other affiliated persons) remains uncertain. Unfortunately for Plaintiff and Class members, the damage is already done because their sensitive Personal Information is confirmed by Amgen to have been disclosed to unauthorized persons during the Data Breach.

28. Amgen knew or should have known that its affected IT systems, servers, or those of their third-party vendors are unsecure and do not meet industry standards for protecting highly sensitive customer Personal Information. On information and belief, Amgen failed to timely make changes to its data security systems, privacy policies, IT systems and servers, and its vendors, exposing its customers' Personal Information to the risk of theft, identity theft, and fraud.

29. The harm caused to Plaintiff and Class members by the Data Breach has already been suffered. The Data Breach creates a heightened security concern for Plaintiff and Class members because their PHI and other sensitive information was potentially disclosed.

30. Amgen had a duty to keep Plaintiff's and Class members' Personal Information confidential and to protect it from unauthorized disclosures. Plaintiff and Class members provided their Personal Information to Amgen with the understanding that Amgen would keep such information confidential and secure from unauthorized disclosures and comply with its privacy obligations and assurances.

31. Defendant's data security obligations were particularly important given the substantial increase in data breaches in recent years, which are widely known to the public and to anyone in Amgen's industry.

**D. <u>Theft of Personal Information Has Serious Consequences for Victims</u>**

32. Data breaches are by no means new, and they should not be unexpected. Business Insider has noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers. . . . Many of them were caused by flaws in . . . systems either online or in stores."[5] It is well known amongst companies that store sensitive personally identifying information that sensitive Personal Information—like PHI and information

[5] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last accessed Aug. 7, 2026).

taken in as part of the employment process—is valuable and frequently targeted by criminals.

33. These types of attacks should be anticipated by companies that store sensitive and personally identifying information, like Amgen, and these companies must ensure that data privacy and security practices and protocols are adequate to protect against and prevent known and expected attacks.

34. Theft of Personal Information is serious. The Federal Trade Commission has warned consumers that identity thieves use Personal Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[6]

35. Indeed, with access to an individual's Personal Information, criminals can do more than simply empty a victim's bank account. They can also commit all manner of fraud, including: obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; obtain lending or lines of credit; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[7]

36. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities;

---

[6] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Aug. 7, 2026).

[7] *See* FEDERAL TRADE COMMISSION, WARNING SIGNS OF IDENTITY THEFT, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Aug. 7, 2026).

obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[8]

37. Personal Information is a valuable property right.[9] The value of sensitive personal information as a commodity is measurable.[10] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[11]

38. Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen PHI, SSNs, financial information, driver's license numbers, and other Personal Information directly on various illegal websites making the information publicly available, often for a price. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and become more valuable to thieves and more damaging to victims.

---

[8] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Jan. 23, 2024).
[9] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[10] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.
[11] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

39. Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including medical identity theft, credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

40. Consumers place a high value on the privacy of sensitive data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[12]

41. There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[13]

42. Given these facts, any company that transacts business with a consumer or takes in sensitive data of employees and prospective employees, and then compromises the privacy of that Personal Information, has thus deprived those persons of the full monetary value of the consumer's transaction with the company.

43. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[14]

---

[12] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[13] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[14] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/.

44. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

**E. Amgen Failed to Act in the Face of a Known Risk of a Data Breach**

45. Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendant failed to take reasonable steps to adequately protect Personal Information, leaving its clients, patients, current and former employees, and potentially others, exposed to risk of fraud and identity theft.

46. Amgen is, and at all relevant times has been, aware that the sensitive Personal Information it handles and stores in connection with providing services and employment is highly sensitive. As a company that requires highly sensitive and identifying information in connection with providing services and employment, Amgen is aware of the importance of safeguarding that information and protecting its systems and products from security vulnerabilities.

47. The Federal Trade Commission has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

48. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Personal Information.

49. Upon information and belief, Defendant failed to properly implement basic data security practices.

50. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Personal Information in its possession or to

comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

51. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Personal Information in its possession. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

52. Several best practices have been identified that at minimum should be implemented by companies in the applicable industry, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data.

53. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

54. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

55. Upon information and belief, Defendant failed to comply with at least one (or all) of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

56. Amgen was aware, or should have been aware, of regulatory and industry guidance regarding data security, and was alerted to the risk associated with failing to ensure that Personal Information was adequately secured.

57. Despite the well-known risks of hackers and cybersecurity intrusions, Defendant failed to employ adequate data security measures in a meaningful way in order to prevent breaches, including the Data Breach.

58. The security flaws inherent to Defendant's IT systems or servers run afoul of industry best practices and standards. Had Defendant adequately protected and secured its servers or systems, and the sensitive Personal Information stored therein, it could have prevented the Data Breach.

59. Despite that Amgen was on notice of the very real possibility of data theft, including through a prior data breach, it still failed to make necessary changes, and permitted a "material" intrusion to occur that resulted in disclosure of Plaintiff's and other Class members' Personal Information to criminals.

60. Defendant permitted Class members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

61. Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[15]

---

[15] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 30, 2017), https://www.reuters.com/article/idUSKBN18M2BY/.

62. As a result of the events detailed herein, Plaintiff and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from the Data Breach, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information and identities; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of possession and privacy of Personal Information; harm resulting from damaged credit scores and information; loss of time and money preparing for and resolving fraud and identity theft; loss of time and money obtaining protections against future identity theft and medical identity theft; and other harm resulting from the unauthorized use or threat of unauthorized exposure of Personal Information.

63. Victims of the Data Breach have likely already experienced harms and are subject to an imminent and ongoing risk of harm, including identity theft and fraud.

64. As a result of Amgen's failure to ensure that its impacted systems and servers were protected and secured, the Data Breach occurred. As a result of the Data Breach, Plaintiff's and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## CLASS ALLEGATIONS

65. Plaintiff brings this action on behalf of himself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a) and (b):

> **Nationwide Class**
> All residents of the United States whose Personal Information was disclosed or otherwise impacted by the Data Breach.

> **Kansas Class**
> All residents of the state of Kansas whose Personal Information was disclosed or otherwise impacted by the Data Breach.

66. Excluded from the Class are: (1) any Judge presiding over this action, members of their immediate families, and Court Staff; and (2) Amgen, its subsidiaries,

parent companies, successors, predecessors, and any entity in which Amgen, or its parents, have a controlling interest, and its current or former officers and directors.

67. **Numerosity**: While the precise number of Class members has not yet been determined, on information and belief, members of the Classes are so numerous that their individual joinder is impracticable, and included tens of thousands of members who are geographically dispersed.

68. **Typicality**: Plaintiff's claims are typical of Class members' claims. Plaintiff and all Class members were injured through Defendant's uniform misconduct, and Plaintiff's claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiff's claims are typical of Class members' claims.

69. **Adequacy**: Plaintiff's interests are aligned with the Class(es) Plaintiff seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and undersigned counsel intend to prosecute this action vigorously. The Class(es)' interests are well-represented by Plaintiff and undersigned counsel.

70. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class member's claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendant's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

71. **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

- whether Defendant engaged in the wrongful conduct alleged herein;
- whether Defendant's data security practices resulted in the disclosure of Plaintiff's and other Class members' Personal Information and the Data Breach;
- whether Defendant violated privacy rights and invaded Plaintiff's and Class members' privacy; and
- whether Plaintiff and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

72. Given that Defendant engaged in a common course of conduct as to Plaintiff and the Classes, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

73. **Injunctive and Declaratory Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### Negligence

74. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

75. Defendant was entrusted with, stored, and otherwise had access to the Personal Information of Plaintiff and Class members.

76. Defendant knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiff and Class members, and to not ensuring that its servers and systems, and the Personal Information, was secure. It also knew of the risks of

entrusting sensitive Personal Information to third party vendors that host data, that do not take the proper precautions to protec that data. These risks were reasonably foreseeable to Defendant.

77. Defendant owed duties of care to Plaintiff and Class members whose Personal Information had been entrusted to it.

78. Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate data security, or to otherwise ensure that their Personal Information is protected. Defendant had a duty to safeguard Plaintiff's and Class members' Personal Information and to ensure that it adequately protected Personal Information. Defendant breached this duty.

79. Amgen's duty of care arises from its knowledge that its customers entrust it with highly sensitive Personal Information that Amgen is required to, and represents that it will, handle securely. Indeed, on its website, Amgen commits to data privacy in its Privacy Policy, and acknowledges the importance of privacy.

80. Only Amgen was in a position to protect against breaches and the harms that Plaintiff and Class members have now suffered.

81. A "special relationship" exists between Defendant, on the one hand, and Plaintiff and Class members, on the other hand. Defendant entered into a "special relationship" with Plaintiff and Class members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiff and Class members in connection with their attempts or efforts to obtain services or employment.

82. But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

83. Defendant acted with wanton disregard for the security of Plaintiff's and Class members' Personal Information.

84. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of duties. Defendant knew or should have known it was failing to meet these duties, and that Defendant's breach would cause

Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

85. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class members have been harmed and face an imminent and ongoing risk of harm.

86. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT II**
**Negligence Per Se**

87. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

88. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Amgen had a duty to provide or ensure adequate data security practices in connection with safeguarding Plaintiff's and Class members' Personal Information.

89. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Amgen had a duty to provide or ensure adequate data security practices to safeguard Plaintiff's and Class members' Personal Information.

90. Defendant breached its duties to Plaintiff and Class members under the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d *et. seq*.), among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with the sale of insurance products and services in order to safeguard Plaintiff's and Class members' Personal Information.

91. Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

92. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

93. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of duties. Defendant knew or should

have known that it was failing to meet its duties, and that a breach would cause Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

94. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class members have been harmed and face an imminent and ongoing risk of harm.

95. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**Breach of Implied Contract**

96. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

97. Amgen provided or provides services and employment to Plaintiff and Class members, or Plaintiff and Class members provided their Personal Information to Amgen in exchange.

98. In connection with these relationships, Plaintiff and Class members entered into implied contracts with Amgen.

99. Pursuant to these implied contracts, Plaintiff and Class members provided Amgen with their Personal Information. In exchange, Amgen agreed, among other things: (1) to take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' Personal Information; and (2) to protect Plaintiff's and Class members' Personal Information in compliance with federal and state laws and regulations and industry standards.

100. The protection of Personal Information was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Amgen, on the other hand. Had Plaintiff and Class members known that Amgen would not adequately protect its customers' Personal Information they would not have done

business with or provided Personal Information in associating or transacting with Amgen.

101. Plaintiff and Class members performed their obligations under the implied contract when they provided Amgen with their Personal Information.

102. Necessarily implicit in the agreements between Plaintiff/Class members and Amgen was Amgen's obligation to take reasonable steps to secure and safeguard Plaintiff's and Class members' Personal Information.

103. Amgen breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect their Personal Information.

104. Amgen's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach.

105. The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of Amgen's material breaches of its agreements.

106. Plaintiff and other Class members were damaged by Amgen's breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national and international market; (vi) they were deprived of the benefit of their bargain; and/or (vii) they lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Classes, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B. Award Plaintiff and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C. Award declaratory and injunctive relief as permitted by law or equity to assure that Class members have an effective remedy, including enjoining Defendant from continuing the unlawful practices as set forth above;

D. Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E. Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Award Plaintiff and Class members such other favorable relief as allowable under law or at equity.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 7, 2026 Respectfully submitted,

*/s/ Tina Wolfson*

TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
ALYSSA BROWN (SBN 301313)
*abrown@ahdootwolfson.com*
YUFEI WANG (SBN 346170)
*ywang@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

*Attorneys for Plaintiff and the Putative Class*